Argued and submitted March 24, 2015, affirmed November 16, 2016, petition for review allowed February 16, 2017 (361 Or 100)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CATALIN VODA DULFU,
*Defendant-Appellant.*

Lane County Circuit Court
201204555; A153918

386 P3d 85

Ryan E. Scott argued the cause and filed the briefs for appellant.

Ryan P. Kahn, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Egan, Judge.

**HADLOCK, C. J.**

Defendant appeals a judgment of conviction for 15 counts of Encouraging Child Sexual Abuse in the First Degree (ECSA I), ORS 163.684,[1] and 15 counts of Encouraging Child Sexual Abuse in the Second Degree (ECSA II), ORS 163.686.[2] Those charges relate to sexually explicit images of children that defendant had placed in a shared folder on a publicly accessible peer-to-peer computer network. Police officers discovered the images through their use of certain software, and defendant argues in his first assignment of error that "the trial court erred by failing to suppress the evidence obtained during the 24/7 surveillance of the defendant's computer." In a second assignment of error, defendant asserts that "the trial court erred by excluding expert testimony that there are reasons other than * * * the purposes of sexual gratification" to possess child pornography. In association with his third through sixth assignments of error, defendant argues that the trial court erred in sentencing him because it miscalculated his criminal-history score. And, seventh, defendant contends that "the trial court erred by imposing [a compensatory fine] in the absence of any proximate cause between defendant's crimes and the pecuniary costs incurred by the victim."

We reject defendant's first assignment of error as foreclosed by our recent decision in *State v. Combest*, 271

---

[1] ORS 163.684, states, in relevant part,

"(1) A person commits the crime of encouraging child sexual abuse in the first degree if the person:

"(a)(A) Knowingly develops, duplicates, publishes, prints, disseminates, exchanges, displays, finances, attempts to finance or sells a visual recording of sexually explicit conduct involving a child or knowingly possesses, accesses or views such a visual recording with the intent to develop, duplicate, publish, print, disseminate, exchange, display or sell it[.]"

[2] ORS 163.686, states, in relevant part,

"(1) A person commits the crime of encouraging child sexual abuse in the second degree if the person:

"(a)(A)(i) Knowingly possesses or controls, or knowingly accesses with the intent to view, a visual recording of sexually explicit conduct involving a child for the purpose of arousing or satisfying the sexual desires of the person or another person[.]"

Or App 38, 56, 350 P3d 222, *rev den*, 358 Or 70 (2015).[3] We reject without discussion defendant's seventh assignment of error, challenging the compensatory fine. Finally, for the reasons that follow, we conclude that the trial court did not err either in excluding defendant's proffered expert-witness testimony or in calculating defendant's criminal history score. Accordingly, we affirm.

We begin by giving a brief overview of the pertinent facts; we provide more factual detail in association with our discussion of each of defendant's assignments of error.

The Department of Justice investigated defendant for the possession and dissemination of child pornography. Fifteen pornographic images, located on a hard drive that had been duplicated from defendant's computer, formed the basis for defendant's prosecution. The fifteen images correspond both to Counts 1 through 15 (ECSA I) and to Counts 16 through 30 (ECSA II), as alleged in the indictment.

The case was tried to a jury and defendant testified in his own defense. Defendant admitted that the images were on his computer, but he denied that he possessed those images for the purpose of arousing or satisfying sexual desires, as required for a conviction of ECSA II. He explained that, instead, he collected the images to resolve issues around his own childhood sexual abuse. In support of that defense, defendant sought to present expert testimony from Dr. Frank Colistro, a licensed clinical psychologist. In part, defendant wanted Colistro to give his expert opinion that

---

[3] In *Combest*, the defendant challenged whether police officers' use of certain software "to seek out and download files from defendant on a peer-to-peer network" and to obtain certain information associated with those computer files "invaded defendant's protected privacy interest" under Article I, section 9, of the Oregon Constitution. 271 Or App at 48. We concluded that the officers' actions did not constitute a search because the information that they were able to obtain using the software—the same software used here—was "the same information that was available to any other user of the network" and "[t]he police obtained that information by zeroing in on shared files that contained child pornography, not by engaging in all-encompassing surveillance of defendant's online activity." *Id.* at 56. We also rejected the defendant's theory that, because the software used "made police practice more efficient," its warrantless use constituted a search. *Id.* at 55. We perceive no meaningful distinction between the police activity here and that at issue in *Combest*.

people sometimes download sexually explicit images of children for reasons other than sexual gratification. Ultimately, the trial court excluded Colistro's testimony on the ground that it was scientific evidence for which defendant had not laid a sufficient foundation.

The jury convicted defendant on all counts. During sentencing, the trial court elevated defendant's criminal-history score based on his convictions in Counts 1 through 4. That resulted in defendant's grid block shifting from 8-I (Count 1) to 8-D (Count 2) to 8-B (Count 3) to 8-A (Counts 4 through 15) and, on Counts 16 through 30, to 5-A. Consequently, the presumptive sentences for Counts 2 through 30 were longer than they would have been had the criminal-history score stayed at "I" for all counts, as defendant had advocated. The trial court ultimately imposed a total sentence of 180 months in prison plus post-prison supervision. The court also imposed fines and fees, including a compensatory fine of $5,000.

Defendant timely appealed his convictions. We first address defendant's challenge to the trial court's exclusion of testimony from defendant's expert witness, Colistro. We review the trial court's rulings about the admissibility of scientific evidence for legal error, *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 300-01, 14 P3d 596 (2000), and we review the facts underlying the admissibility of scientific evidence *de novo*. *State v. Branch*, 243 Or App 309, 314, 259 P3d 103, *rev den*, 351 Or 216 (2011). In this case, the facts are largely undisputed.

A chronological summary of the relevant proceedings is helpful to understand defendant's arguments about Colistro's proffered testimony. As pertinent here, defendant sought to have Colistro testify that, in general—and not specific to defendant—some individuals who possess child pornography collect it for reasons other than sexual gratification.[4] Before the start of trial, the court held a hearing pursuant to OEC 104, in part to determine the admissibility

---

[4] Defendant also sought, unsuccessfully, to introduce Colistro's testimony on additional topics. On appeal, defendant does not challenge the court's rulings excluding that other testimony.

of that testimony.[5] During the hearing, the court stated, "I think everyone agrees that the proffered evidence in this case is scientific evidence" that must meet "a minimum level of scientific validity that must be relevant to the question that the jury is going to have to resolve and helpful for them in resolving those questions." In fact, defendant did not dispute that Colistro's testimony was scientific evidence during the OEC 104 hearing but, instead, focused solely on laying the proper foundation for scientific evidence.

At the conclusion of the OEC 104 hearing, the trial court expressed agreement with defendant that the testimony was relevant because "there's [a] presumption that looking at child pornography is for a sexual purpose." The court reasoned,

"I think the simple way of saying it is, if the State's going to rely on 'he had it, so he must have been using it for sexual purpose,' and he says, 'I wasn't,' the fact that an expert comes in and says, in my experience and my training there are other non-sexual purposes that people may do this, I think is probative to the jury, and I don't think it confuses them, and I think it may be helpful."

The court did not rule on whether it would admit Colistro's testimony, however; rather, it deferred ruling until trial, to see whether defendant would testify and whether defendant would provide a proper foundation for Colistro's testimony under *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995).

Defendant did testify at trial. He did not dispute that he downloaded the images at issue. He contended, however, that he did so not for the purposes of sexual gratification, but in response to the sexual abuse that he had suffered as a child. According to defendant, his reaction to that abuse prompted him to compulsively collect and organize the pornographic images on his computer.

---

[5] "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section. In making its determination the court is not bound by the rules of evidence except those with respect to privileges." OEC 104(1).

After defendant testified, and out of the jury's presence, defendant renewed his request for Colistro to testify that some individuals download sexually explicit images of children for reasons other than sexual gratification. At that point, defendant asserted for the first time that, under *State v. Stafford*, 157 Or App 445, 972 P2d 47 (1998) and *State v. Perry*, 347 Or 110, 218 P3d 95 (2009), Colistro's testimony was not scientific evidence and, therefore, should be admitted even if defendant did not lay a *Brown/O'Key* foundation. Second, defendant asserted that he was prepared to present that kind of foundation if necessary.

The court first ruled that Colistro's proffered testimony was scientific. Accordingly, defendant called Colistro to the stand to provide foundational evidence for his anticipated trial testimony. The parties did not dispute that Colistro's education and professional experience qualified him as an expert. Colistro then testified in, essentially, an extension of the OEC 104 hearing. After hearing that testimony (aspects of which we discuss below) and argument from the parties, the court concluded that Colistro's testimony pertaining to reasons that one might possess child pornography did not meet the foundational requirements for scientific evidence. Accordingly, the court excluded that testimony.

On appeal, the parties largely reiterate the arguments that they made below, disagreeing both about whether Colistro's testimony was "scientific evidence" and, if it was, whether defendant laid an adequate foundation for it. We begin by addressing whether Colistro's testimony constituted "scientific evidence" for which defendant was required to lay a foundation under *Brown* and *O'Key*.

In considering whether challenged testimony is "scientific evidence," the primary consideration is "whether the expert's assertions 'possess significantly increased potential to influence the trier of fact as scientific assertions[.]'" *State v. Marrington*, 335 Or 555, 562, 73 P3d 911 (2003) (quoting *O'Key*, 321 Or at 292). In other words, if jurors would view the evidence as having "an usually high degree of persuasive power" because of the perception that it is based on scientific assertions, then the underlying foundation for the evidence must be valid. *Id.* at 561 (quoting *O'Key*, 321 Or at 291-92,

and explaining that evidence is scientific for purposes of the *Brown/O'Key* framework when it "draws its convincing force from some principle of science, mathematics and the like").

For example, in *Perry*, the defendant was charged with various crimes based on a child's report that the defendant had sexually abused her. 347 Or at 112. The child made her report several months after the crimes allegedly had occurred. At the defendant's trial, the court permitted an expert witness for the state, the medical director of CARES Northwest who held various advanced degrees, including an M.D. and a Ph.D., to testify that children who have been sexually abused often delay in reporting that abuse. In concluding that the testimony was offered as "scientific evidence," the Supreme Court found significant the fact that the witness had presented herself as having a scientific background and "as an expert in her field whose knowledge was based, at least in part, on studies, research, and scientific literature." *Id.* at 121. Consequently, the court concluded that the witness's testimony regarding delayed disclosure was scientific evidence and had to meet "the standard described in *Brown* and *O'Key* for admission of such evidence." *Id.*; *see also Marrington*, 335 Or at 562 ("[A] court must determine whether the expert's assertions 'possess significantly increased potential to influence the trier of fact as scientific assertions[.]'" (Quoting *O'Key*, 321 Or at 292.).

Similarly, defendant presented Colistro as having significant education and experience in behavioral sciences, including a bachelor's degree in psychology, a master's degree in counseling psychology, and a doctorate in counseling psychology. Colistro also testified that he is a licensed psychologist, licensed sex-offender treatment provider, has written or participated in 80 different papers and presentations on the topic of psychology, and has attended more than 200 additional advanced psychology trainings. Indeed, Colistro's testimony made use of terms such as "specialized literature," "body of literature," and "psychiatrist;" that is, he used the vocabulary of scientific research.

Significantly, defendant sought to link Colistro's scientific background with his opinion—although based on

personal, professional observations—that some people collect child pornography for reasons other than sexual gratification. First, he emphasized that Colistro is "licensed as much as one possibly can be," including as "a licensed sex offender treatment provider." After questioning Colistro to confirm that licensing status, defendant continued:

> "Q. So, based on your training and experience, which, as you said is based on specialized literature and all of that other stuff and your certification, based on your training and experience, have you been able in the past to determine or to form an opinion * * * as to why an individual looks at child pornography?
>
> "A. Yes."

Colistro then (still outside the presence of the jury) gave his opinion that some people may possess or hoard child pornography not for sexual gratification, but because they suffer "some form of anxiety-related disorder," like obsessive/compulsive disorder.

Thus, defendant essentially tied Colistro's ability to opine on possible motivations for possessing child pornography to his professional background and experience as a scientist. Under those circumstances, the trier of fact would have perceived testimony delivered by Colistro to be "scientific," that is, to be grounded on conclusions that have been reached through application of a scientific method to collected data. The trial court did not err when it determined that Colistro's testimony about some individuals' nonsexual reasons for downloading and possessing child pornography would be "scientific evidence."[6]

---

[6] Defendant relies on *Stafford* in support of his position that Colistro's testimony was not "scientific evidence." 157 Or App at 455. In *Stafford*, the defendant was charged with sex crimes against children. At his trial, the state introduced testimony from a licensed clinical psychologist who described "grooming" behaviors "that offenders generally go through to prepare a victim for * * * eventual abusive behavior." *Id.* at 448. A plurality of this court, sitting en banc, agreed with the state's contention that the psychologist's testimony was not "scientific evidence" because "evidence based on *personal observation* that does not draw its convincing force from a principle of science is not 'scientific evidence' within the meaning of *Brown*." *Id.* at 455 (emphasis added). Defendant contends that Colistro's proffered testimony was not scientific because it was based on his personal observations.

Because Colistro's testimony was scientific evidence, it would be admissible only if it were (1) relevant under OEC 401, (2) of some assistance to the trier of fact under OEC 702, and (3) not subject to exclusion under OEC 403, because its probative value is outweighed by the danger of unfair prejudice or jury confusion. *Brown*, 297 Or at 409; *O'Key*, 321 Or at 297-99. In this case, as in many other cases involving the admissibility of scientific evidence, we must determine "whether scientific evidence is probative under OEC 401" and conduct the "relevancy and prejudice analysis implicated in OEC 702's helpfulness standard[.]"[7] *Jennings*, 331 Or at 302 (quoting *Brown,* 297 Or at 417); *see also Brown,* 297 Or at 409 (stating that a court must "identify and evaluate the probative value of the evidence, consider how it might impair rather than help the factfinder, and decide whether truthfinding is better served by exclusion or admission").

In *Brown* and *O'Key*, the Supreme Court identified a number of factors that a court may consider in performing its "vital role of gatekeeper, screening proffered scientific testimony to determine whether it is sufficiently valid, as a matter of science, to legitimately assist the trier of fact and exclud[ing] bad science in order to control the flow of

---

For at least two reasons, we find *Stafford* unhelpful here. First, as this court has noted on multiple occasions, *Stafford* left this court deeply divided. *State v. Hites-Clabaugh*, 251 Or App 255, 259 n 1, 283 P3d 402 (2012) ("whether or not a scientific foundation needed to be laid for this type of expert testimony * * * evenly divided this court in *State v. Stafford*"); *see also State v. Swinney*, 269 Or App 548, 556 n 3, 345 P3d 509, *rev den*, 357 Or 743 (2015). Thus, it produced multiple opinions but little resolution.

Second, post-*Stafford* Supreme Court decisions have emphasized that whether evidence is "scientific" depends on how it "would be perceived" by the trier of fact. *Perry*, 347 Or at 120; *Marrington*, 335 Or at 561. *Stafford* took a different approach, evaluating whether proffered testimony was "scientific" based on (1) the topic to which it was directed (the defendant's intent, not to "providing a psychological picture of [the] defendant as an abuser or his credibility") and (2) the basis for the testimony (the witness's own professional observations, rather than psychological testing or another scientific methodology). 157 Or App at 458. *Stafford*'s approach to determining whether evidence is scientific—which did not focus on how the trier of fact would perceive the evidence—cannot be squared with the subsequent Supreme Court cases.

[7] "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." OEC 702.

confusing, misleading, erroneous, prejudicial, or useless information to the trier of fact." *Marcum v. Adventist Health System/West*, 345 Or 237, 244, 193 P3d 1 (2008) (internal citations and quotations omitted). Those factors include:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert."

*Brown*, 297 Or at 417.[8]

In considering the question of scientific validity, courts must bear in mind that the factors listed in *Brown* and *O'Key* are not exclusive and are not to be used as a mechanical checklist requiring an affirmative finding with respect to each factor. *O'Key*, 321 Or at 300. Whatever factors may be relevant in a particular case, the party offering the scientific evidence has the burden of establishing that it is scientifically valid. *Perry*, 347 Or at 122. That is, the party offering the scientific evidence must establish that the evidence "possesses sufficient indicia of scientific validity to be helpful to the jury under OEC 702." *State v. Sanchez-Alfonso*, 352 Or 790, 801, 293 P3d 1011 (2012).

In arguing that he met that burden, defendant relies heavily (indeed, nearly exclusively) on Colistro's qualifications and his experience in evaluating and treating many people who have been accused of, or have admitted to, possessing child pornography. But, as the state points out,

---

[8] The court identified four other factors in *O'Key*, which "overlap, to some degree, with the seven factors set out in *Brown*." *State v. Southard*, 347 Or 127, 134 n 5, 218 P3d 104 (2009).

"They are: (1) whether the theory or technique can and has been tested; (2) whether the theory or technique has been subject to peer review; (3) the known or potential rate of error; and (4) the degree of acceptance in the relevant scientific community."

*Id.*

an expert's qualifications are insufficient, standing alone, to establish the scientific validity of that expert's testimony. We must consider the other *Brown/O'Key* factors to determine the scientific validity of the techniques that Colistro used to arrive at his conclusion that some individuals have reasons other than sexual gratification for possessing child pornography. We begin by briefly summarizing Colistro's direct testimony about those techniques, which we have reviewed *de novo. See Branch*, 243 Or App at 314 ("We review the facts underlying the admissibility of scientific evidence *de novo.*").

Colistro explained that he determined individuals' subjective motivation for possessing child pornography by utilizing his clinical skills, training, and experience as a psychologist. In general, he performed clinical evaluations based on his knowledge of the "basic standards for diagnosing various conditions and addressing issues such as causality." So, for example, Colistro described how "a conventional clinical assessment" could lead him to determine whether an individual had a "mental illness in Axis I" and whether "there is significant Axis II disturbance, in general, related to criminal propensities." If the individual had such a disturbance, then Colistro would "apply various risk assessment protocols" to determine whether the individual had characteristics of sexual deviancy, including pedophilia or pedophilic tendencies. If a person did not have such a deviancy, Colistro might infer that the individuals' behaviors—including possession of child pornography—were caused by something other than sexual deviancy, such as anxiety or an obsessive disorder. Colistro testified that his evaluations relied heavily on background information about his patients obtained through criminal history records, interviews with friends and family, and his patients' self-reports, among other sources. Indeed, Colistro characterized his evaluations as "not a quantitative assessment, it's a qualitative assessment."

In analyzing whether the evidence—largely consisting of Colistro's testimony—establishes the scientific validity of his technique for determining that people have reasons other than sexual gratification for possessing child pornography, we first consider whether that technique has "general acceptance in the field." *Brown*, 297 Or at 417. In

that regard, we credit Colistro's testimony that he administered clinical evaluations that, themselves, are generally accepted in the scientific community. As we understand it, Colistro views his technique as, essentially, a form of differential diagnosis, by which he evaluates whether an individual who possessed child pornography has a mental illness or a personality disorder that reflects a "sexual deviancy"; in the absence of such a deviancy, he may conclude that the individual possessed the child pornography for purposes other than sexual gratification.

The technique of differential diagnosis is, itself, an accepted technique by which—in the usual medical context—a physician "develops a list of all diseases that might cause a patient's symptoms and then, by a process of elimination, narrows the list." *Jennings*, 331 Or at 291; *see Sanchez-Alfonso*, 352 Or at 802 (noting court's recognition of differential diagnosis as "an accepted technique"). However, "testimony is not admissible simply because the expert conducted a differential diagnosis." *Id.* at 803 (quoting *Marcum*, 345 Or at 247-48). Rather, the expert's "scientifically valid basis" for "ruling in" and "ruling out" the potential causes must be adequately explained. *Id.* (quoting *Marcum*, 345 Or at 252-53).

In this case, Colistro was unable to point to any scientific study, literature, or data—outside of his own experience—to support his use of a sort of differential-diagnosis technique to arrive at the conclusion that some individuals' motivations for possessing child pornography are nonsexual. He did not point to any scientific support for his assertion that a person who possesses child pornography, yet does not show signs of "sexual deviancy" during a clinical evaluation, must possess those images for some reason other than sexual gratification. That is, he did not explain why, having "ruled in" sexual deviancy as one possible reason that a person could possess child pornography, the "ruling out" of sexual deviance leaves only nonsexual motivations for that behavior. For example, Colistro acknowledged that a person could possess and be aroused by child pornography without meeting the DSM criteria for a diagnosis of pedophilia. Thus, the fact that Colistro's opinion was based on his application of something like a differential diagnosis

does not, itself, weigh in favor of a determination of scientific validity.

Moreover, Colistro did not testify that his particular technique for assessing individuals' motivations for possessing child pornography is widely accepted in the scientific community. Indeed, his testimony suggested the contrary:

"Q. Well, let me give you an example. In the child abuse field, when they are determining whether a child has been abused, they have widely accepted medical models for child sexual abuse assessments. They have ways to assess whether a child has been abused.

"I'm asking you, are there any widely accepted models for assessing whether or not somebody was sexually aroused when they viewed a child pornography video or image?

"A. No."

Other *Brown/O'Key* factors also weigh against a determination that there is a valid scientific basis for Colistro's technique for determining whether an individual who possesses child pornography does so for the purpose of sexual gratification. We focus first on the *Brown/O'Key* factors that relate to testing and use of the technique itself. Colistro did not testify that anybody else has used his method for evaluating the reasons why individuals possess child pornography. Thus, no evidence regarding "the use which has been made of the technique" supports its scientific validity. *Brown*, 297 Or at 417. Nor does anything in the record suggest that Colistro's technique "can be (and has been) tested" or "has been subject to peer review and publication." *O'Key*, 321 Or at 303-04 (internal quotation marks omitted). Colistro acknowledged that he could not provide—nor was there a way to measure—a potential rate of error for his technique. He also acknowledged that his particular use of clinical assessments for this purpose is novel.

Shifting focus to the scientific literature, Colistro's technique fares no better. Although Colistro pointed to specialized literature and studies supporting the process of clinical assessments and treatment for sex offenders, including users of child pornography, he was not able to identify any specialized literature or studies that "discuss[] motives, and

can demonstrate motives, other than sexual arousal for reasons why people view child pornography." Colistro was not aware of any study in which people in his field "have examined whether there is a validity to people having reasons other than sexual arousal for viewing child pornography."

Moreover, the trial court found troubling—as do we—that Colistro determined the motivation of people who possess child pornography, "first and foremost, by the self report of the individuals" and that "the subjective interpretation of the expert is a substantial portion of these tests." That two-fold, subjectiveness also weighs against a determination of scientific validity. *Brown*, 297 Or at 417.

In sum, only Colistro's qualifications and his use of techniques (clinical evaluations and differential diagnosis) that are generally accepted in *other* contexts weigh in favor of a determination of scientific validity. The remainder of the *Brown/O'Key* factors weigh against such a determination, and their weight is far more substantial. We conclude that defendant failed to lay an adequate foundation for Colistro's scientific testimony regarding individuals' possible motivations for possessing child pornography. Accordingly, the trial court did not err when it excluded that testimony.

We turn to defendant's challenge to his sentence, which the trial court imposed pursuant to the felony sentencing guidelines.

> "For most felony convictions, Oregon's sentencing guidelines prescribe a presumptive sentence based on the seriousness of the offense and the defendant's criminal history. The guidelines also instruct trial courts on how to calculate a defendant's criminal history. * * * [T]he guidelines provide that, when a court sentences a defendant for multiple convictions in a single sentencing proceeding, the sentence imposed on the first conviction counts as part of the defendant's criminal history in determining the sentence for the second conviction *unless the convictions arose out of a single criminal episode.*"

*State v. Cuevas*, 358 Or 147, 149-50, 361 P3d 581 (2015) (emphasis added) (internal citation omitted). Thus, a "court may use a defendant's convictions arising from earlier criminal episodes to calculate the defendant's criminal history

score with respect to a crime arising from a later criminal episode." *State v. Witherspoon*, 250 Or App 316, 321, 280 P3d 1004 (2012). The use of one conviction to elevate the criminal history score for a second conviction is sometimes referred to as "reconstituting" the defendant's criminal history score. *See, e.g., State v. Jones*, 274 Or App 723, 725, 362 P3d 899 (2015).

In this case, defendant's initial criminal-history score, used to identify his presumptive sentence for Count 1, was "I," the lowest on the sentencing-guidelines grid. Defendant argues that the court erred three times: when it reconstituted his criminal history score "I" to "D" for Count 2, when it identified his criminal-history score as "B" for Count 3, and when it identified his criminal-history score as "A" for Count 4 and all remaining counts in the judgment. In that regard, he argues that "reconstituting the defendant's grid score after each conviction was a violation of Oregon Supreme Court precedent, which has held that the discovery of contraband during the execution of a single search constitutes one criminal episode, regardless of when the contraband was obtained." We disagree.

This court has observed that "criminal episode" is a term that "has been used in so many diverse statutory and constitutional contexts within the criminal law that its precise meaning in any given context, much less its origins, is not always clear." *State v. Potter*, 245 Or App 1, 6, 260 P3d 815 (2011), *rev den*, 351 Or 586 (2012). In the context of calculating a defendant's criminal history score for the purposes of sentencing, we have applied ORS 131.505(4), the statutory definition of "criminal episode" that governs our double jeopardy analysis. *See, e.g., Witherspoon*, 250 Or App at 321-23. Under ORS 131.505(4), crimes arise from the same criminal episode when they are part of "continuous and uninterrupted conduct that * * * is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective." Notably, "[t]he first step in the analytical sequence by which we determine whether crimes arise from the same criminal episode requires us to consider whether a complete account of one [crime] *necessarily* includes details of the other or, framed

another way, whether the crimes are cross-related." *State v. Nesbit*, 274 Or App 694, 698, 361 P3d 649 (2015) (internal quotation marks omitted; brackets and italics in *Nesbit*).

Defendant's argument is premised on the fact that the warrant seizing defendant's hard drive was executed on a single day and, thus, that he possessed the images simultaneously on that day. Accordingly, defendant contends, those acts of possession occurred as a part of the same "criminal episode" under *State v. Boyd*, 271 Or 558, 533 P2d 795 (1975). For the following reasons, we disagree.

First, defendant's argument overlooks the trial court's finding, which the record supports, that defendant initially obtained possession of the images by downloading them on "eight separate dates." As pertinent here, the court found that "at least * * * a four-calendar day break" occurred "between each instance" of the acts of downloading and then possessing images that form the basis for Counts 1 through 5. At least, under the circumstances of this case, each of defendant's acts in downloading a specific, sexually-explicit image can be described without recounting the details of his acts of downloading other images. Under the settled analytical framework described in *Nesbit*, the separate acts of possession are not part of a single criminal episode.

Second, a recent decision of this court dictates the outcome in this case. In *Orchard v. Mills*, 247 Or App 355, 270 P3d 309 (2011), *rev den*, 352 Or 33 (2012), a post-conviction petitioner who had been convicted of seven counts of felon in possession of a firearm (FIP) argued that his trial counsel should have objected to the trial court's calculation of his criminal history score. In the petitioner's view, because he possessed the weapons simultaneously—and they "were found in the same place at the same time"—it followed that the crimes were part of a single criminal episode. *Id.* at 360. We rejected that argument, holding that the "key consideration [was] whether the guns were acquired by separate acts." *Id.* at 361. Because the record included evidence that the petitioner had acquired the firearms separately, the petitioner's seven acts of FIP were not part of a single criminal episode for purposes of sentencing. *Id.*

Here, too, defendant took possession of the images on different days. Accordingly, the trial court did not err in determining that each of those acts was a separate "criminal episode." It is irrelevant under *Orchard* that, once defendant had downloaded all of the images over an extended period of time, he possessed them simultaneously.

We acknowledge some tension between *Orchard* and *Boyd*, on which defendant relies. In *Boyd*, police officers found drugs and a stolen television set in the defendant's home. 271 Or at 560. The defendant was charged in two separate indictments for theft of the television and possession of the drugs. A jury acquitted the defendant of the theft charge, and the defendant then moved to dismiss the drug indictment on the ground that her trial on the theft charge had placed her in jeopardy as to the drug charge as well. *Id.* at 561. The Supreme Court held that the trial court should have granted that motion because the state had not charged the defendant "with the acts which eventually culminated in [her] possession of the television set and the drugs" but, instead, had brought "a single charge of illegal possession of goods at one time and place." *Id.* at 570. Focusing on a hypothetical defendant's possession of illegal drugs, the court stated that, "[o]nce unlawful possession of goods, without more, is recognized as criminal conduct, there is no reason for fragmenting the criminal conduct into as many parts as there are different items of property, however acquired." *Id.* at 570-71. Finally, in a single conclusory sentence, the court asserted that the result should be no different "simply because the items of contraband happen to be of different types." *Id.* at 571. Accordingly, the court concluded, the initial theft prosecution barred the subsequent prosecution for drug possession. *Id.*

We decline to apply that rationale from *Boyd* in this case for several reasons. First, *Boyd* did not actually address the circumstance present here, where the state proved that defendant acquired distinct items on different dates. Nothing in *Boyd* establishes when the defendant in that case acquired the television or drugs at issue. Consequently, it does not speak to the possible significance (or insignificance) of different dates of acquisition except in *dictum*. Second, the conclusion in *Boyd* is at least arguably

incompatible with the primary test it described—whether the charges "are so closely linked in time, place, and circumstance that a complete account of one charge cannot be related without relating details of the other charge." *Id.* at 565. Its conclusion that the "condition of possession" *always* is a unitary act is largely unexplained. *See id.* at 571 (using that term). Third, as we have consistently explained in subsequent cases applying the test described in *Boyd* (rather than its conclusion), crimes "are not cross-related, and thus do not necessarily include details of one another, where one of the crimes may be proved without evidence of the other crime." *Witherspoon*, 250 Or App at 322. Application of that test here, as explained above, leads to the conclusion that defendant's crimes were not part of a single criminal episode.[9] Fourth, defendant's serial acquisition (and resultant possession) of images of multiple victims of childhood sexual abuse, separated by significant periods of time, constitutes distinct criminal acts that cannot *subsequently* be transformed into a single episode of criminal behavior simply because of the fortuity that—at some later point—police officers discovered all of the pornography at one time. After all, had defendant serially obtained, possessed for some period of time, and then destroyed each image—so that his possession of one image did not overlap with his possession of another—there would be no question that his acts constituted multiple criminal episodes. The fact that he retained the images, collecting them over time, should not lessen the significance of his behavior for purposes of sentencing.

In short, the trial court did not err in calculating defendant's criminal history scores.

Affirmed.

---

[9] As noted in *Witherspoon*, crimes may arise from the same criminal episode even when an account of one does not necessarily include details of another if "the crimes were part of 'continuous and uninterrupted conduct that *** is so joined in time, place and circumstances that [the] conduct is directed to the accomplishment of a single criminal objective.'" 250 Or App at 323 (quoting ORS 131.505(4)). Defendant does not argue that the "single criminal objective" rationale applies here.