Argued and submitted April 29, 2011, remanded for resentencing; otherwise affirmed June 6, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DUSTIN LEE WITHERSPOON,
*Defendant-Appellant.*

Lane County Circuit Court
200912920, 190911299A;
A143178 (Control), A144059, A144060

280 P3d 1004

Erik Blumenthal, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael R. Washington, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Edmonds, Senior Judge.

ARMSTRONG, P. J.

Edmonds, S. J., dissenting.

**ARMSTRONG, P. J.**

Defendant appeals a judgment convicting him of, among other offenses, misdemeanor fourth-degree assault, ORS 163.160, menacing, ORS 163.190, and felony fourth-degree assault, ORS 163.160(3). He assigns error to the court's calculation of his criminal history score for purposes of sentencing him on the felony fourth-degree assault charge, arguing that the court erred in counting the other two convictions as part of his score and, as a result, erred in sentencing him to 14 months' imprisonment on that count. The issue on appeal is whether defendant's conviction for felony fourth-degree assault arose from a separate criminal episode from his convictions for misdemeanor fourth-degree assault and menacing. For the reasons that follow, we remand for resentencing and otherwise affirm.

Defendant stipulated to the pertinent facts, which come from a statement of defendant's wife, M. Defendant awoke one evening at 9:30 p.m. and expressed his frustration with M for not waking him earlier. M sent defendant's son, C, who had been preparing to go to bed, to his bedroom. Defendant yelled at M for leaving the window of his office open and accused her of searching the office. After she told him that "he needed to stop throwing a temper tantrum," defendant grabbed M's hair and pulled her head back, aggravating a bulging disc in her neck, and continued to yell at her, referring to her in derogatory terms and stating that he hoped that she "rotted from [cancer] slowly." She slapped him, and he let her go.

Defendant persisted in yelling at M, questioning her about why they had so many condoms in their bathroom and accusing her of marital infidelity. He told her that she needed to leave, presumably the house, and she responded that it was he who needed to leave, which led defendant to grab her and shake her violently.

Defendant and M eventually moved to the bathroom, where he accused her of using cocaine. She denied the accusation, and, after further argument, defendant left the

bathroom and went to the kitchen, where he knelt on the floor and yelled at M, who had followed him into the kitchen, to hit him. When she refused, he pulled a kitchen knife out of a drawer and forcibly placed it in her hand, yelling at her to stab him with it. She reached down and pulled his hair until he released his hold on her hand in which he had placed the knife.

After defendant released his hold on her hand, M "jumped over him and ran into the living room [to use a telephone] to call 9-1-1" for help. Defendant followed her and, while she held the phone in her hand, pulled the phone's cord out of the wall. M fled to C's bedroom and told C that they were going to leave the house. Defendant followed M to the bedroom and told her that she was not going to take C. C was crying and wrapped his arms around M. Defendant told C to stop crying and said that M was brainwashing him into fearing defendant. Defendant pulled C and M apart, shook M again, and threw her against a bookshelf. Defendant then grabbed C and slammed his face into the ladder of his bunk bed.

Defendant forced M out of the bedroom and again told C that M was brainwashing him. Defendant then left the bedroom and told M that he was going to the store for cigarettes. It was approximately 3:00 a.m. by that point. Defendant later returned to the house, retrieved a blanket, and proceeded to sleep in M's van.

As relevant to this appeal, defendant was convicted of three criminal counts involving M: Count 1, misdemeanor assault, for pulling M's head back and aggravating her neck injury; Count 2, menacing, for placing M in fear of imminent serious physical injury when he shook her in the living room and pulled the knife out of the drawer in the kitchen; and Count 4, felony assault, for throwing her against the bookshelf in C's bedroom.

At sentencing, the state asked the court to count defendant's convictions on Counts 1 and 2 as part of defendant's criminal history score in sentencing defendant on Count 4. The state contended that, because Counts 1 and 2

constituted two separate "person Class A misdemeanors" and because Count 4 arose from a separate incident that came after the events that gave rise to his convictions on Counts 1 and 2, defendant's criminal history score on Count 4 should be "D" rather than "I."[1]

Defendant's counsel responded that the counts did not involve separate incidents because "there was no opportunity [for defendant] to withdraw or calm down between them. Incidents one and two were part of a single, continuous argument with" M. He began to refer to Count 4 but was interrupted by a question from the court. Defense counsel then responded, "It was all done as part of one incident where [defendant] was angry, arguably out of control. He did not have a cooling-down period sufficient to stop." Eventually, defense counsel specifically contended that Count 4 was part of the same episode as the other two counts.

The state responded that there was a break in time between the events that occurred in the living room, bathroom, and kitchen and those that occurred in C's bedroom. In response to the parties' arguments, the court stated that it had no "problem finding that [Count 4] was separate and came later." The court ultimately determined that defendant's criminal history score on Count 4 was "D" and that Count 4 fell in category 6 of the crime seriousness scale under the sentencing guidelines.

However, instead of imposing the presumptive sentence of 14 months' imprisonment on Count 4 under grid block 6-D of the sentencing guidelines, the court ordered a downward departure sentence of 36 months' probation.[2] As a probation condition, the court prohibited defendant from

---

[1] The state contended that defendant's two Class A misdemeanor convictions for Counts 1 and 2 combined to equal a felony conviction for criminal history score purposes, thereby qualifying defendant for a criminal history score of "D" for sentencing on Count 4. *See* OAR 213-004-0008 ("Every two prior adult convictions of person Class A misdemeanors in the offender's criminal history shall be counted as one adult conviction of a person felony for criminal history purposes."); OAR 213-004-0007 ("D—The offender's criminal history includes one adult conviction * * * for a person felony[.]").

[2] Had the court not included Counts 1 and 2 in defendant's criminal history score, defendant would have been sentenced under grid block 6-I, which provides a presumptive sentence of 36 months' probation. OAR 213-004-0007; OAR 213-005-0008.

having any contact with M or C. Defendant subsequently violated the terms of his probation by contacting M, and the court revoked his probation and sentenced him to the presumptive sentence of 14 months' imprisonment on Count 4.

Defendant appeals, contending that the court erred in calculating his criminal history score on Count 4 and, consequently, erred in imposing 14 months' imprisonment on that count. The state disputes those contentions. We agree with defendant.

A defendant's criminal history score is used to calculate the sentence that a court imposes under the sentencing guidelines. OAR 213-004-0006; *State v. Norman*, 216 Or App 475, 485, 174 P3d 598 (2007), *vac'd in part on other grounds*, 345 Or 319, 207 P3d 423 (2008). The court calculates the defendant's criminal history by assessing several factors, including the number and severity of the defendant's prior convictions. OAR 213-004-0006; *Norman*, 216 Or App at 485.

When a court imposes sentences for multiple convictions in a single proceeding, the court may use a defendant's convictions arising from earlier criminal episodes to calculate the defendant's criminal history score with respect to a crime arising from a later criminal episode. *Norman*, 216 Or App at 485 (citing *State v. Bucholz*, 317 Or 309, 317, 855 P2d 1100 (1993)).[3] However, "when a defendant's multiple convictions stem from the same criminal episode, his criminal history score remains the same with respect to all of those convictions." *Id.* at 485-86. In other words, a conviction cannot be included in a defendant's criminal history score for purposes of imposing sentence on another crime if the second crime could not have been prosecuted separately from the first, that is, if double jeopardy principles required the two crimes to be prosecuted together. Accordingly, the determination whether defendant's convictions for Counts 1 and 2 could be included in his criminal history score in sentencing him on Count 4

---

[3] In *Bucholz*, the Supreme Court held that, when multiple convictions occur in a single proceeding, a court may recalculate a defendant's criminal history score for one conviction based on the other convictions, provided that those other convictions arose from an earlier criminal episode. *Norman*, 216 Or App at 485.

turns on whether, in accordance with double jeopardy principles, the counts had to be prosecuted together. *See id.* at 486.

In *State v. Potter*, 236 Or App 74, 234 P3d 1073 (2010), we set out the analytical sequence by which to determine whether crimes arise from the same criminal episode for purposes of double jeopardy. The court first considers "whether 'a complete account of one [crime] *necessarily* includes details of the other' " or, framed another way, whether the crimes are "cross-related." *Id.* at 82-83 (quoting *State v. Boyd*, 271 Or 558, 566, 533 P2d 795 (1975)) (emphasis in *Potter*). If a complete account of each crime necessarily includes details of the other, then they arise from the same criminal episode. Crimes are not cross-related, and thus do not necessarily include details of one another, where one of the crimes may be proved without evidence of the other crime. *See State v. Lyons*, 161 Or App 355, 363, 985 P2d 204 (1999) (determining that charges underlying a violation of the Oregon Racketeer Influenced and Corrupt Organizations Act (ORICO) and the ORICO violation, itself, were not cross-related because proof of the underlying charges did not "in any way depend on proof of the ORICO violation").

Here, defendant contends that "the facts of each [count] were so linked in time, place, and circumstance that one [crime] could not be explained without relating the facts of the other[,]" emphasizing that "one could not take one aspect of the defendant's conduct and explain it as a discrete event without providing the context of the domestic dispute of that evening." We conclude that, although the events that led to the three relevant counts in this case would have provided useful context for proving each count, defendant's conviction for Counts 1 and 2 in no way depended on proof of Count 4. Thus, the three counts are not cross-related, and a complete account of Counts 1 and 2 does not necessarily include details of Count 4.

Where a complete account of one crime does not necessarily include details of another, the crimes may nonetheless have arisen from the same criminal episode, depending on consideration of the factors listed in ORS 131.505(4)—*viz.*,

whether the crimes were part of "continuous and uninterrupted conduct that * * * is so joined in time, place and circumstances that [the] conduct is directed to the accomplishment of a single criminal objective." Here, the court found "that the [Count 4] felony was separate and came later" in relation to Counts 1 and 2. We defer to the trial court's findings of fact "to the extent they are supported by evidence in the record." *Potter*, 236 Or App at 82. Hence, defendant's challenge to the court's calculation of his criminal history score on Count 4 reduces to whether there is evidence in the record to support the court's finding that Count 4 was separate from Counts 1 and 2 for purposes of the test established in ORS 131.505(4).

Our review of the record leads us to conclude that it lacks such evidence. The state based its prosecution of defendant on Count 2 on defendant's actions in shaking M in the living room and pulling out a knife from a drawer in the kitchen. The record establishes that M responded to defendant pulling out the knife by fleeing from him: after forcing him to release his hold on her hand by pulling his hair, she "jumped over him and ran into the living room [to use a telephone] to call 9-1-1." Defendant chased M into the living room and continued to direct threatening conduct toward her by ripping the phone's cord out of the wall while she held the phone in her hand, thereby preventing her from obtaining relief from defendant's abuse by calling for help. M responded by going to C's bedroom and telling C that they were leaving the house. However, defendant pursued M into the bedroom, where defendant continued his abusive behavior by throwing M into a bookshelf.

Thus, the record establishes that M attempted to escape from defendant's abusive behavior in the kitchen by running to the living room to use a phone to call 9-1-1, which defendant thwarted by ripping the phone's cord out of the wall, and then fleeing to C's room so that she could leave the house with C to escape from defendant's abusive behavior, at which point defendant continued the abuse by throwing M into a bookshelf. There is no evidence in the record from which the trial court could find that that series of events was interrupted. Instead, the record establishes that Counts 2

and 4 arose from continuous and uninterrupted conduct by defendant that was joined in time, place, and circumstances.[4]

Counts 2 and 4 also shared a common criminal objective of harassing and injuring the victim through physical and emotional abuse. *State v. Kautz*, 179 Or App 458, 39 P3d 937 (2002), is illustrative. In that case, the defendant entered the victim's workshop, took various items of personal property, and put those items in a car at the workshop. *Id.* at 460. As the defendant left the workshop, the victim saw him taking the car, pointed a gun at him, and demanded that he stop. The defendant pointed a shotgun, which he had taken from the workshop, at the victim, told him to "back off," and ran away. *Id.*

Based on those actions, the defendant was charged with burglary and robbery. He contended that the court incorrectly applied the sentencing guidelines in calculating his sentence because the burglary and robbery arose from a single criminal episode. *Id.* at 464-65. The state contended that the court correctly determined that the burglary and the robbery arose from separate criminal episodes because the two crimes were not directed at the same criminal objective. The state contended that the objective of the burglary was to steal the victim's property while the objective of the robbery was to threaten the victim so that the defendant could escape with the property that he had stolen.

We concluded "that that kind of parsing of [the] defendant's criminal objective is inconsistent with the intent of ORS 131.505(4)." *Id.* at 467. We concluded that the crimes

---

[4] We need not address whether the record establishes that Counts 1 and 4 arose from continuous and uninterrupted conduct by defendant that was joined in time, place, and circumstances in order to reach the conclusion that the court erred. If Counts 2 and 4 arose from a single criminal episode, but Counts 1 and 4 arose from separate criminal episodes, then defendant would have only one Class A misdemeanor conviction for the purpose of determining his criminal history score for sentencing on Count 4. *Norman*, 216 Or App at 485. Had the court included only Count 1 in defendant's criminal history score, defendant would have been sentenced under grid block 6-H, which provides the same presumptive sentence as grid block 6-I. OAR 213-004-0007; OAR 213-005-0008. Thus, defendant's presumptive sentence for Count 4 would be the same whether we conclude that the behavior underlying both Counts 1 and 2 occurred in the same criminal episode as Count 4 or conclude that the behavior underlying Count 2 occurred in the same criminal episode as Count 4.

arose from a single criminal episode, explaining that, although the "defendant may have acquired an additional criminal objective to escape when confronted by [the victim], his earlier objective to steal [the victim's] property continued during the course of all of the events." *Id.*

The present case is similar. Defendant physically and emotionally abused M throughout the course of the night in response to a series of alleged actions by M, *viz.*, failing to wake defendant, leaving a window open, searching defendant's office, committing marital infidelity, engaging in illegal drug use, and attempting to leave the house with C. Nonetheless, to accept that defendant's criminal objective changed over the course of the abuse would improperly parse defendant's criminal objective.[5]

As in *Kautz*, where the defendant's objective of taking the victim's property continued even when he threatened the victim with a shotgun to facilitate his escape, here, defendant's objective of abusing the victim in the kitchen continued into the living room and eventually into C's bedroom as she attempted to escape his abuse. Although defendant may have acquired the additional objective in C's bedroom that the dissent ascribes to him, *viz.*, to stop M from taking C with her as she tried to flee from defendant, defendant's earlier and ongoing criminal objective to harass and abuse M continued throughout the episode.[6]

---

[5] The Supreme Court cautioned in *Boyd* against construing the phrase "directed to the accomplishment of a single criminal objective," too narrowly. 271 Or at 565 n 4. A narrow understanding of that phrase would fail to afford a defendant the protection that our constitution provides against successive prosecutions, a protection that the court concluded the legislature intended to replicate in adopting ORS 131.505(4). *Id.*

[6] It is unclear whether the objective that the dissent identifies, stopping M from leaving the house with C, can be considered to be a criminal objective, because it is unclear on this record whether preventing M from taking C from the house would constitute a crime if the manner in which defendant did that were not otherwise criminal. Of course, if that objective is not a criminal objective, then that is a further reason to reject the dissent's thesis.

In contrast, defendant's conduct in ripping the telephone cord out of the wall to prevent M from calling 9-1-1 did, in fact, add a new criminal objective to the criminal episode, that of interfering with making a report to a 9-1-1 emergency reporting system. *See* ORS 165.572. However, as in *Kautz*, the addition of another criminal objective does not detract from the focus on the overarching criminal objective that is required under a proper application of the standard that the legislature established in ORS 131.505(4) to protect people against double jeopardy. *See, e.g., Boyd*, 271 Or at 562-71, 565 nn 4-5.

Because Counts 2 and 4 arose from continuous and uninterrupted conduct that was joined in time, place, and circumstances and that shared a common criminal objective such that it would violate double jeopardy principles to prosecute defendant separately for the two counts, we conclude that the record does not support the trial court's conclusion that Count 4 was separate from Count 2 for purposes of calculating defendant's criminal history score on Count 4. It follows that the court erred in calculating defendant's criminal history score on Count 4 to be "D" and in sentencing defendant to the presumptive sentence of 14 months' imprisonment under the sentencing guidelines on the basis of that score. We therefore must remand this case for resentencing.

Remanded for resentencing; otherwise affirmed.

**EDMONDS, S. J.,** dissenting.

As framed by the parties, this case presents a question of first impression: whether, under OAR 213-004-0006, the trial court erred when it imposed the sentence on Count 4 based on defendant's convictions on Counts 1 and 2. Defendant argues that his convictions on Counts 1, 2, and 4 were the result of a continuous and uninterrupted course of conduct against the same victim and, therefore, the court erred when it reconstituted defendant's criminal history score on Count 4 based on his convictions on Counts 1 and 2 and thereafter imposed a 14-month prison term after the revocation of defendant's probation. In the majority's view, defendant had only one overarching criminal objective and the fact that he formed an additional criminal objective when he committed the crime of assault against the victim is of no legal consequence. For the reasons that follow, I respectfully disagree with the majority's conclusion that the addition of another criminal objective does not authorize the imposition of a separate sentence for the commission of a separate crime.

Preliminarily, the majority and I do not appear to disagree on what the record expresses regarding the events that led to defendant's convictions. Rather, we disagree on the legal import of those facts for purposes of sentencing under OAR 213-004-0006.[1] Also, we agree that the primary

---

[1] The legal determination that convictions for crimes arise out of separate criminal episodes is based on a factual finding that the acts that give rise to the

test for determining whether defendant had more than one criminal objective is not satisfied by the facts in this case in that Counts 2 and 4 are not so interrelated that a complete account of the details of Count 2 cannot be described without referring to the details of Count 4, and *vice versa*.

With those understandings in mind, I turn to the allegations of the charging instrument which provide the foundation for defendant's convictions. Count 2 alleges that defendant committed the crime of menacing by "intentionally attempt[ing] to place [M] in fear of imminent serious physical injury by words or conduct[.]" Count 4 alleges that defendant committed the crime of felony assault in the fourth degree constituting domestic violence by "recklessly caus[ing] physical injury to [M], the said acts having been committed in the immediate presence of, or witnessed by a minor child or stepchild of the defendant or victim, or by a minor child residing within the household of the defendant or of [M]."

Factually, the circumstances in this case involve three people, defendant, his wife, M, and defendant's son, C, and their interactions during a time period that began at approximately 9:30 p.m. and ended about 3:00 a.m. The circumstances underlying the allegation in Count 2 are that defendant and M became involved in a violent argument regarding defendant's claim that M had been cheating on him with his friend, R, including an incident during which defendant pulled M's hair. Defendant told M that she had to leave, and M told defendant that he needed to leave. The argument "went on for hours." At some point in time, and after defendant had accused M of hiding objects in the bathroom, they went into the bathroom. Defendant, pointing to cut marks on the sink, accused M of cutting cocaine, an accusation that M denied.

Defendant then left the bathroom and went into the kitchen. Defendant grabbed a kitchen knife, placed it in M's hand, screamed at her, and urged her to kill him. M forced defendant to let go of her hand and fled to the living room in

convictions are not part of continuous and uninterrupted conduct that is so joined in time, place, and circumstance that it is directed to the accomplishment of a single criminal episode. *State v. Yashin*, 199 Or App 511, 514, 112 P3d 331, *rev den*, 339 Or 407 (2005).

order to call the police. Before she could call 9-1-1, defendant pulled the phone cord from the wall. M then left the living room and went into C's room. As is evident from the above description, defendant's criminal objective during the above time period in the kitchen and the living room was to cause M to be in *fear* of imminent serious physical injury and was unrelated to C, who was not present in the kitchen or living room at the time.[2]

After departing from the living room, M attempted to leave the house with C. There is no evidence that M desired or attempted to leave the residence before that point in time. When M entered C's bedroom, C climbed down from his bunk bed and embraced her. Defendant followed M into C's bedroom, stating to her that he was not doing anything to frighten C and accusing M of brainwashing C. The conduct for which defendant was convicted in Counts 4, 5, and 6 occurred thereafter in C's bedroom.

That conduct is described in the record by M's statements at defendant's stipulated facts trial:

> "[Defendant] then pulled [C] and I apart and started shaking me and threw me into a bookshelf. I then saw [C] flying to the ladder of his bunk bed and heard [C] groan. [Defendant] told him to stop acting like he had just hurt him, that he had not thrown him. [Defendant] then grabbed [C] and slammed his face first into the ladder and told him to get the fuck up on his bed and stay there. [C] was so scared he was saying 'Yes, sir; yes, sir.'

> "[Defendant] then shoved me out of [C]'s room and was holding the door shut. [Defendant] was telling [C], 'I love you son. [M] is brainwashing you.' I got back into the room and told [defendant] that it was not okay to bring this fight in front of [C]. [Defendant] said I had done that by trying to—leaving with [C]."

Defendant then left C's bedroom, went back into C's room "still ranting," then went back to the living room and stated that he "was going to the store for cigarettes" and that "[C]

---

[2] M had told C to go to his room when the argument between defendant and M began about 9:30 p.m.

and I better not—better be here when he got back." Defendant then left the residence and did not return except to obtain a blanket so that he could sleep in a van.

As the result of his conduct in C's bedroom, defendant was convicted of assaulting M in the presence of C (Count 4), assaulting C (Count 5), and recklessly endangering the welfare of C (Count 6), as well as misdemeanor assault in the fourth degree and menacing arising out of his conduct that occurred before M went into the bedroom. At sentencing, the trial court ruled that defendant's convictions on Counts 1 and 2 arose out of the same criminal episode but that the conduct that occurred in C's bedroom constituted a separate criminal episode. That ruling resulted in an enhancement of defendant's criminal history score for purposes of sentencing on Count 4. In the majority's view, that ruling was error. Although it acknowledges that defendant formed a discrete criminal objective in the bedroom to prevent M and C from leaving the residence that he had not held previously, it characterizes that objective as a mere "additional objective" that "does not detract from the focus on the overarching criminal objective that is required under a proper application of the standard that the legislature established in ORS 131.505(4) to protect people against double jeopardy." 250 Or App at 325 n 6. The issue therefore is whether the majority has reached the correct legal conclusion based on the above facts.

In *State v. Bryant*, 245 Or App 519, 263 P3d 368 (2011), this court explained:

" '[A] defendant's criminal history score is used to calculate the sentence the court is to impose. OAR 213-004-0006. The score is determined by several factors, including the number and character of the offender's prior convictions. *Id.* When multiple convictions occur in the same proceeding, ones occurring in an earlier criminal episode may be used to recalculate the defendant's criminal history score with respect to convictions stemming from a later criminal episode. *State v. Bucholz*, 317 Or 309, 317, 855 P2d 1100 (1993); *State v. Allen*, 151 Or App 281, 290-91, 948 P2d 745 (1997). In contrast, when a defendant's multiple convictions stem from the same criminal episode, his criminal

history score remains the same with respect to all of those convictions.' "

*Id*. at 522 (quoting *State v. Norman*, 216 Or App 475, 485-86, 174 P3d 598 (2007), *vac'd on other grounds*, 345 Or 319, 207 P3d 423 (2008)) (emphasis omitted). As noted above, one circumstance that could determine whether there are multiple criminal episodes for purposes of OAR 213-004-0006 is whether the circumstances are so interrelated that a complete account of one offense cannot be related without relating the details of the others. *Bryant*, 245 Or App at 523. If that test is applied, the trial court did not err.

The majority's alternative proposed test is rooted in former jeopardy principles as expressed in ORS 131.505(4). That statute provides that a criminal episode means "continuous and uninterrupted conduct that establishes at least one offense and is so joined in time, place and circumstance that such conduct is directed to the accomplishment of a single criminal objective." Nothing in the language of the statute supports the understanding that an additionally acquired criminal objective that operates to either supplant or accompany an initial criminal objective will have the legal effect of prohibiting a separate conviction and/or sentence for the conduct that carries out that objective.

Rather than being based on the language of ORS 131.505(4), the majority's "additional criminal objective" rule appears to be derived from its interpretation of the holdings in *State v. Boyd*, 271 Or 558, 533 P2d 795 (1975), and *State v. Kautz*, 179 Or App 458, 39 P3d 937 (2002). It is therefore critical to the analysis that *Boyd* and *Kautz* be understood for what they hold and what they do not hold. In *Boyd*, the indictment against the defendant charging him with possession of controlled substances had been dismissed because of a prior unsuccessful prosecution of the defendant for theft arising from the possession of stolen property. On review, the Supreme Court held that the statutory bar in ORS 131.505(4) and the "same act or transaction" in permissive joinder statutes were synonymous. 271 Or at 565-66. The practical effect of that conclusion, according to the court, was that, whenever a prosecutor becomes aware of multiple charges facing a defendant, the prosecutor must make a determination about

whether they arose out of the same criminal episode. In the case before it, the court held that, because the possession of the television set and the drugs existed at the same place and time, there existed only a single criminal episode, and therefore, the prior unsuccessful prosecution for theft barred the subsequent prosecution for possession of controlled substances. *Id.* at 570-71.

As is evident from the above description, the majority's construct regarding the enhancement of a sentencing factor does not find support from the facts or the holding in *Boyd*. Rather, the majority relies on language in footnotes 4 and 5 of the opinion. Footnote 4 refers to the attempt by the court to clarify how the phrase "same act or transaction" as used in *State v. Brown*, 262 Or 442, 497 P2d 1191 (1972),[3] and the phrase "same criminal episode" found in ORS 131.505(4) relate to each other. *Boyd*, 271 Or at 560. In footnote 4, the *Boyd* court states, in part,

> "This finding of equivalence is dependent upon the meaning given 'circumstances' and 'directed to the accomplishment of a single criminal objective' in ORS 131.505(4). It is *possible* to construe these terms so narrowly that 'same criminal episode' would fail to include a wide range of cases which fall clearly within the intention of *Brown*. Even the facts of *Brown* itself might not fall within a narrow reading of ORS 131.505(4)."

271 Or at 565 n 4 (emphasis in original). In footnote 5, the *Boyd* court states,

> "This test, based upon the cross-relationships between the facts of each of the charges is not, however, broad enough to cover all factual situations where the double jeopardy principle would require joinder. It should be observed that the single episode definition in ORS 131.505(4) is formulated upon the hypothesis that the accused has engaged in conduct which involves a sequence of events that flow in a continuous and uninterrupted way

---

[3] In *Brown*, the defendant, an ex-convict, was arrested while carrying a concealed weapon. He was convicted of carrying a concealed weapon and subsequently prosecuted for being a convicted person in possession of a firearm. The court held that because both charges were based on the single act of carrying the firearm, constitutional principles of double jeopardy barred the second prosecution. 262 Or at 443-44, 458.

and that all of these events can be plotted on a plane of time, as where the accused is charged with killing a teller in the course of robbing a bank, or where a bank cashier makes a series of false reports to the commissioner of banking to conceal a series of thefts of money from the bank.

"The statute was not intended to deal with the situation where there is only *one act* which results in the commission of multiple crimes as where the accused kills two victims by firing one bullet or where (under prior Oregon law) the accused is charged with larceny and shoplifting for the same theft, or where, as in *State v. Brown*, the accused is charged with carrying a concealed weapon and with being a convict in possession of a concealable weapon."

271 Or at 566 n 5 (emphasis in original).

In *Kautz*, the issue was whether a burglary and a robbery committed by the defendant were part of the same criminal episode for purposes of determining whether the trial court was authorized to impose consecutive sentences for the crimes. The predicate to the imposition of consecutive sentences under the sentencing guidelines is whether the crimes were committed as part of the same criminal episode. While in the course of committing the burglary, the defendant grabbed a gun that he had stolen and pointed it at the property owner who had surprised him. Telling the property owner to "back off!" the defendant escaped by running through a hedge and disappearing into a nearby field. Observing that the *Boyd* court had held that a "criminal episode" is synonymous with the phrase "same act or transaction," and applying ORS 131.505(4) to the facts of the case, we utilized the test of whether the burglary and robbery were so joined in "time, place and circumstance that a complete account of each charge cannot be related without also relating the details of the other charge." *Kautz*, 179 Or App at 466. Although the state argued that the defendant had dual criminal objectives—the objective of the burglary was to steal the victim's property and the objective of the robbery was to threaten the victim so that the defendant could escape—we rejected that argument. We explained,

"While [the] defendant may have acquired an additional criminal objective to escape when confronted by [the victim], his earlier objective to steal [the victim's] property

continued during the course of all of the events. Because the facts underlying the robbery and burglary were so closely joined in time, place and circumstances as to show that [the] defendant continued to pursue the same criminal objective to deprive [the victim] of his property, we conclude that the trial court erred in concluding that the burglary and the robbery were separate criminal episodes." .

*Id.* at 467 (footnote omitted).

When correctly understood, neither ORS 131.505(4) nor the case law supports the majority's conclusion that the trial court erred by using the convictions for Counts 1 and 2 in enhancing the criminal risk history score for purposes of imposing a sentence on Count 4.[4] The established test under *Kautz* for determining whether the statute governs is whether the crimes committed are not so closely joined in time, place, and circumstance so that one could not be related without reference to the other. The majority concedes that the conduct underlying Counts 1 and 2 in this case could be related without reference to what occurred to M and to C in the bedroom. Moreover, what distinguishes this case from *Kautz* are the facts themselves. In *Kautz*, the defendant threatened the use of a weapon to facilitate or carry out the commission of his initial and sole criminal objective. In this case, when defendant followed M into the bedroom and assaulted her, that assault was unrelated to the reasons underlying his earlier conduct. Rather, his objective in assaulting her was to prevent her from leaving with C, an objective that he had not previously held with regard to his

---

[4] ORS 131.515(2) provides that "[n]o person shall be separately prosecuted for two or more offenses based upon the same criminal episode, if the several offenses are reasonably known * * * at the time of * * * the first prosecution * * *." In this case, the state complied with the provisions of ORS 131.515(2), and defendant correctly does not raise the issue of double jeopardy. It is correct that the definition of "criminal episode" in ORS 131.505(4) applies to ORS 131.515(2) but, as to the issue before us, the statutory definition of "criminal episode" plays a role only because it has been grafted into the sentencing case law. Because no constitutional provision or statute directly addresses the issue before us in terms of former or double jeopardy, the majority's belief that the trial court's ruling violated double jeopardy principles by enhancing defendant's sentence on Count 4 because of his convictions on Counts 1 and 2 is puzzling. Said another way, it is unclear why the majority believes that the legislature's test under ORS 131.505(4) for determining when a single criminal episode occurs is constitutionally inadequate.

earlier menacing and assaultive conduct. Defendant's conduct may have been continuous and uninterrupted, but it was not directed at the accomplishment of a single criminal objective as the statute requires.[5]

For these reasons, I dissent.

---

[5] Assume that a person breaks into a dwelling in order to steal its contents. While inside, the person decides to set the house on fire in order to cover up his burglary. For purposes of ORS 131.505(4), the burglary and the arson would be held to have arisen out of the same criminal episode. Assume, however, that the person, while inside the dwelling, decides that because of his dislike of the owner, he will set the house on fire. Under that scenario, he has acquired an additional criminal objective (his spite directed at the owner), an objective that would result in more than one criminal episode occurring under ORS 131.505(4). The point of the hypothetical is this: whether the "accomplishment of a single criminal objective" rule in ORS 131.505(4) controls the analysis depends on the reasons underlying the criminal conduct and not on whether there is an overarching criminal objective as the majority posits.