Submitted March 22, 2016, affirmed March 15, 2017

**DALLAS LEE WELSH,**
*Petitioner-Appellant,*

*v.*

**Jeri TAYLOR,**
Superintendent,
Two Rivers Correctional Institution,
*Defendant-Respondent.*

Umatilla County Circuit Court
CV131714; A157358

392 P3d 366

Jed Peterson and O'Connor Weber LLP filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and Doug M. Petrina, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Tookey, Judge, and DeHoog, Judge.

**DEHOOG, J.**

Petitioner was convicted of one count of unlawful delivery of methamphetamine within 1,000 feet of a school, ORS 475.892, one count of unlawful delivery of heroin within 1,000 feet of a school, ORS 475.852, and three counts of felon in possession of a firearm, ORS 166.250(c).[1] He appeals from a judgment denying his petition for post-conviction relief from those convictions on the ground that he received inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. Petitioner contends that trial counsel was inadequate for failing to argue that the trial court should have applied the "shift-to-I" rule in imposing consecutive sentences. Defendant superintendent counters that the shift-to-I rule is inapplicable because petitioner's convictions did not arise from a single "criminal episode" under ORS 131.505(4).[2] For the reasons set forth below, we conclude that the post-conviction court correctly determined that the shift-to-I rule did not apply to petitioner's convictions, and that trial counsel did not provide inadequate assistance in failing to argue that the rule did apply. Further, we conclude that the post-conviction court correctly determined that petitioner was not prejudiced by trial counsel's decision not to make that argument. Accordingly, we affirm the court's denial of post-conviction relief.

We review the denial of a post-conviction claim of inadequate assistance of counsel for legal error. *Yeager v. Maass*, 93 Or App 561, 564, 763 P2d 184 (1988). We are bound by the post-conviction court's findings of historical fact if there is evidence in the record to support them. *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002). If the post-conviction court did not make express factual findings, and "there is evidence from which such facts could be

---

[1] Petitioner was also charged with one count of possession of methamphetamine, one count of possession of heroin, and three additional counts of felon in possession of a firearm. Those counts were dismissed by the trial court and are not subject to this appeal.

[2] ORS 131.505(4) defines a "criminal episode" as "continuous and uninterrupted conduct that establishes at least one offense and is so joined in time, place, and circumstances that such conduct is directed to the accomplishment of a single criminal objective."

decided more than one way, we will presume that the facts were decided in a manner consistent with the [court's] ultimate conclusion." *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

We state the following facts in accordance with those standards. Salem police officers became interested in petitioner's apartment after the manager reported an unusual number of people entering and leaving the apartment. When officers later entered the residence to execute a warrant for petitioner's arrest, they observed evidence of criminal activity, including "methamphetamine and guns all over the place," which led to the issuance of a search warrant for the residence. In the course of the ensuing search of the home for methamphetamine, officers also found a large amount of heroin in two backpacks. The search of petitioner's apartment resulted in the seizure of 113.4 grams of heroin, 45.9 grams of methamphetamine, scales, packaging materials, detailed drug records, $3,000 in cash, and six firearms. When officers asked petitioner what items they would find in his apartment, he claimed not to know exactly what they would find, but said that "everything" in the home belonged to him. He explained that the firearms had been given to him either as "collateral" or in trade for drugs. He also said that all of the firearms in the apartment were his and were "for show." Petitioner told the officers that he had been selling methamphetamine for only a short period of time, and that the $3,000 was money that he had collected to "re-up," or purchase more methamphetamine.

Petitioner was subsequently indicted for 10 felony drug and weapon offenses based on evidence found during the search of his home. Pursuant to plea negotiations, petitioner entered guilty pleas to Count 1, delivery of methamphetamine within 1,000 feet of a school, Count 3, delivery of heroin within 1,000 feet of a school, and Counts 5, 7, and 10, felon in possession of a firearm, and the state moved to dismiss the remaining charges. Under the terms of the plea agreement, both parties were free to make recommendations regarding sentencing to the trial court. At sentencing, the state argued for the maximum amount of prison time available under the sentencing guidelines on each count, to be served consecutively, for an aggregate sentence of 180

months. Defense counsel initially argued for a 41-month prison term on both Count 1 and Count 3 to be served consecutively, with an additional 25-month term to run concurrently on Counts 5, 7, and 10, but consecutively to Counts 1 and 3, for an aggregate sentence of 107 months' imprisonment. Counsel argued that,

> "although these were separate crimes, the guns—you know, we pled to separate guns, it was all part of a similar situation, and consequently should run concurrent."

The trial court imposed an aggregate sentence of 120 months' incarceration and 36 months of post-prison supervision. Specifically, on Count 1, the methamphetamine charge, the court found that petitioner's sentencing grid block was an 8A and imposed 45 months' imprisonment; on Count 3, the heroin charge, the court likewise calculated petitioner's grid block to be 8A and imposed 45 months' imprisonment to be served consecutively to Count 1; and on Counts 5, 7, and 10, the firearm charges, petitioner's grid block was a 6A and the court imposed 30 months' imprisonment to be served concurrently with each other but consecutively to Counts 1 and 3. After the court imposed that sentence, the following colloquy occurred:

> "[TRIAL COUNSEL]: I guess for the purposes of the record, we would object to the consecutive sentences on the delivery charges.
>
> "* * * * *
>
> "THE COURT: They're separate—obviously, I don't think there's any argument at all in terms of the guns and the sales. Is there any need to argue my ability to impose consecutive sentences between delivery of heroin on one hand and delivery of methamphetamine on the other hand?
>
> "[THE STATE]: I think the charging document is sufficient, Your Honor. I mean, I don't think—if it was different theories as it relates to the same controlled substances, but I think the fact that we're talking about more than one controlled substance is sufficient legally speaking for the Court to impose consecutive sentences.
>
> "THE COURT: I agree, but I will note your objection."

Petitioner subsequently sought post-conviction relief alleging various claims, only one of which is before us on appeal.[3] In that claim, petitioner alleged that trial counsel provided inadequate assistance of counsel under Article I, section 11, and the Sixth Amendment. Specifically, petitioner asserted that trial counsel should have argued for application of the shift-to-I rule, OAR 213-012-0020(2)(a)(B), at sentencing. At his post-conviction trial, petitioner argued that the shift-to-I rule applied to his convictions because they all were for conduct that petitioner engaged in during a single "criminal episode" under ORS 131.505(4). The superintendent countered that petitioner's convictions arose from separate criminal episodes because, among other things, petitioner formed separate objectives to sell each controlled substance and to possess the firearms. The post-conviction court denied petitioner's request for relief in a memorandum opinion stating, in relevant part, the following:

"Petitioner's crimes were alleged for May 14, 2010, and included counts of commercial delivery of methamphetamine and heroin and unlawful possession of an array of firearms. He contends that this represents a 'single criminal objective.' Petitioner has not proven that his facts apply to only one objective. As set forth in the state's brief, 'it is apparent that petitioner had multiple buyers and multiple sales.' He took the guns, likely at different times, as collateral for drug sales. This was an ongoing, money-making enterprise, not some isolated criminal act.

"Petitioner also has not shown, that had objection been made, that Judge Wilson would have ruled in Petitioner's favor, or set up a viable appeal issue. Petitioner's claim is denied in its entirety."

As we understand the court's ruling, based on its determination that petitioner's crimes did not arise under the same "criminal episode" under ORS 131.505(4), the post-conviction court further concluded both (1) that trial counsel, employing similar reasoning, reasonably could have concluded that the shift-to-I rule did not apply to petitioner's

---

[3] Petitioner first filed a direct appeal in the underlying criminal case, assigning as plain error the trial court's failure to apply the shift-to-I rule at sentencing. We affirmed without opinion. *State v. Welsh*, 256 Or App 144, 300 P3d 311, *rev den*, 353 Or 788 (2013).

case and, for that reason, reasonably could have declined to argue at sentencing that the shift-to-I rule applied; and (2) that petitioner was not prejudiced by trial counsel's failure to advance such an argument because, ultimately, it would have failed on its merits.

We begin by reviewing the applicable standards for petitioner's post-conviction claim. ORS 138.530(1)(a) provides that a post-conviction petitioner is entitled to relief for a

> "substantial denial in the proceedings resulting in petitioner's conviction, or in the appellate review thereof, of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void."

To establish a claim for inadequate assistance of counsel under Article I, section 11, petitioner must show by a preponderance of the evidence that "trial counsel failed to exercise reasonable professional skill and judgment and that petitioner suffered prejudice as a result." *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991); ORS 138.620(2). A petitioner demonstrates prejudice by showing that trial counsel's deficiency had a tendency to affect the result of the prosecution. *Krummacher v. Gierloff*, 290 Or 867, 874, 627 P2d 458 (1981). Similarly, to raise a claim for ineffective assistance of counsel under the Sixth Amendment, a petitioner must show that counsel's performance was deficient and that the deficient performance caused actual prejudice to the defense. *Strickland v. Washington*, 466 US 668, 687, 104 S Ct 2052, 80 L Ed 2d 674 (1984). The state and federal standards for adequate performance are functionally equivalent. *Montez v. Czerniak*, 355 Or 1, 6-7, 322 P3d 487 (2014). Further, we note that petitioner's claim for inadequate assistance of counsel requires us to consider the statute underlying that claim as a lawyer would have seen it at the time of petitioner's sentencing. *See, e.g., Burdge v. Palmateer*, 338 Or 490, 498, 112 P3d 320 (2005) (stating that, when evaluating whether a defense attorney would have recognized a statutory ambiguity and would have argued for an interpretation that would benefit the defendant, "we look at the statute as a lawyer would have seen it at the time").

On appeal, petitioner renews his argument that any criminal defense attorney exercising reasonable professional skill and judgment would have recognized the significance of the felony sentencing guidelines, including the shift-to-I rule, and would have argued for the application of that rule if it would have resulted in a lesser sentence. Petitioner reasons that, had trial counsel successfully argued for the application of the shift-to-I rule at sentencing, then the applicable grid blocks would have been 8A on Count 1, 8I on Count 3, and 6I on Counts 5, 7, and 10, resulting in a total maximum sentence of 63 months' imprisonment.

Under OAR 213-012-0020(2)(a)(B), when a trial court imposes consecutive sentences, it must "shift to column I" on the criminal history scale for all sentences that the court imposes consecutively to its sentence for the "primary offense."[4] The shift-to-I rule applies only when consecutive sentences are imposed for crimes that arise from a "single criminal episode." *State v. Miller*, 317 Or 297, 305-06, 855 P2d 1093 (1993). In determining whether the shift-to-I rule applies, we rely on the statutory definition of "criminal episode" that governs our double jeopardy analysis, ORS 131.505(4). *See, e.g., State v. Allen*, 151 Or App 281, 291-92, 948 P2d 745 (1997).[5] Under ORS 131.505(4), crimes arise from the same "criminal episode" when they are part of "continuous and uninterrupted conduct that * * * is so joined in

---

[4] OAR 213-012-0020 states, in relevant part:

"(1) When the sentencing judge imposes multiple sentences consecutively, the consecutive sentences shall consist of an incarceration term and a supervision term.

"(2)(a) Subject to the provisions of subsection (b) of this section, the presumptive incarceration term of the consecutive sentences is the sum of:

"(A) The presumptive incarceration term or the prison term defined in OAR 213-008-0005(1) imposed pursuant to a dispositional departure for the primary offense, as defined in OAR 213-003-0001(17); and

"(B) Up to the maximum incarceration term indicated in the Criminal History I Column for each additional offense imposed consecutively."

[5] We have often observed that "criminal episode" is a term of art whose precise meaning may vary with the context in which it is applied. *See, e.g., State v. Dulfu*, 282 Or App 209, 223, 578 P3d 393 (2016), *rev allowed*, 361 Or 100 (2017). We have consistently, however, relied on the definition of "criminal episode" under ORS 131.505(4) for purposes of determining a defendant's criminal history score under the sentencing guidelines. *See id.*

time, place, and circumstances that such conduct is directed to the accomplishment of a single criminal objective."

Petitioner contends that all of his convictions arose out of the same "criminal episode" within the meaning of ORS 131.505(4). Turning to that provision, we first observe that the text of ORS 131.505(4) indicates that a "critical factor in treating criminal conduct as a unitary event *** is *not* the coincidence of 'time, place, and circumstance' *** *but the resulting inference* that the conduct is 'directed to the accomplishment of a single criminal objective.'" *State v. Cloutier*, 286 Or 579, 595, 596 P2d 1278 (1979) (emphases added). In determining a defendant's "criminal objective," our focus is on the "singleness" of a defendant's criminal objective based on the defendant's criminal conduct. *Id.* at 596. Further, the legislative history of ORS 131.505(4) indicates that our analysis of whether conduct is directed to the accomplishment of a single criminal objective is "an objective determination." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Procedure Code, Final Draft and Report § 26, 17 (Nov 1972).

In considering whether criminal conduct is directed toward a "single criminal objective" in the double jeopardy context, we have previously observed that the objective of an immediate act is often pursued as a step toward a more distant goal. *State v. Kessler*, 297 Or 460, 465, 686 P2d 345 (1984). For example, in *State v. Hathaway*, 82 Or App 509, 511, 728 P2d 908 (1986), an undercover agent ordered a gram of cocaine from the defendant. Because the defendant had only half a gram of cocaine available at the time, the agent purchased that amount from her, then returned later the same day to purchase an additional half gram. *Id.* As a result of those sales, the defendant was charged by separate indictments with two counts of delivery of cocaine. *Id.* In determining whether both transactions were directed toward a "single criminal objective" within the meaning of ORS 131.505(4), we acknowledged that the defendant's distant or overriding goal was to "fill a customer's order" but that, even though she

"may have had the same objective in making each delivery (to receive payment for delivering illegal drugs), her

objective was not a *single* one. It would not make sense to hold that a defendant can convert a number of deliveries over a period of time into a single criminal episode by announcing in advance an intention to deliver a large quantity."

*Id.* at 515 (emphasis in original). Accordingly, we concluded that the defendant's acts were not directed toward a "single criminal objective." *Id.* at 516.

Further, we have recognized that a defendant does not form a "single criminal objective" if the defendant makes discrete decisions to commit each of several offenses. For example, in *State v. Sparks*, 150 Or App 293, 296-97, 946 P2d 314 (1997), the defendant argued that the shift-to-I rule applied to three burglary convictions arising from allegations that the defendant had unlawfully entered and committed crimes in three vacant rooms of a motel. Although the defendant had committed the burglaries serially, we determined that the defendant in that case had "formed a discrete criminal objective each time he made an unlawful entry" and, therefore, his convictions arose from separate criminal episodes within the meaning of ORS 131.505(4). *Id. See also State v. Knight*, 160 Or App 395, 404, 981 P2d 819 (1999) (concluding that the defendant's actions constituted two discrete decisions to commit separate entries and therefore to commit two separate burglaries).

Turning to petitioner's specific arguments on appeal, he argues against a narrow construction of a "single criminal objective" under ORS 131.505(4), and contends that his convictions arose from the "same criminal episode" because he was engaged in the "single criminal objective" of running a drug-dealing enterprise. Petitioner contends that identifying two criminal objectives—one for each controlled substance in this case—would result in improperly "parsing" his criminal objective. *See State v. Kautz*, 179 Or App 458, 467, 39 P3d 937 (2002) (stating, in a double jeopardy context, that "parsing" a defendant's criminal objective is inconsistent with ORS 131.505(4)). He argues that, because the indictment alleged that all of his offenses occurred on May 14, 2010, and the police discovered evidence of those offenses on the same date and in a single location, his

conduct was "continuous and uninterrupted" and "so joined in time, place, and circumstances" as to constitute a single criminal episode under ORS 131.505(4). As for the firearm offenses, he specifically reasons that his statement that he used the firearms as collateral in his drug trade supports the conclusion that his possession of the firearms was part of the same course of continuous and uninterrupted conduct aimed toward "making money from the sale of controlled substances."

In response, the superintendent argues that the evidence shows that petitioner had a separate criminal objective for selling each controlled substance and for possessing the firearms. The superintendent points to petitioner's statement that he had only been selling methamphetamine for a short time and that the cash found in his apartment was specifically set aside to buy more methamphetamine— as opposed to more heroin—as supporting the finding that petitioner had two separate drug-dealing operations, one for each controlled substance. The superintendent further notes that each of the delivery charges was based on a theory of attempted or constructive delivery,[6] which was predicated on petitioner's possession of quantities of each controlled substance inconsistent with personal use, indicating that he intended to sell the controlled substance. *See State v. Garcia*, 120 Or App 485, 488, 852 P2d 946 (1993). The superintendent argues that the various pieces of evidence supporting petitioner's delivery conviction—including his possession of large quantities of heroin and methamphetamine, along with drug records, scales, and packaging indicating his intent to sell those drugs—also supports the inference that he had accumulated those materials at different times. Thus, the superintendent argues, the post-conviction court could have found that petitioner completed separate acts of constructive delivery on different dates despite the single date alleged in the indictment and the discovery of all the evidence on that same date. As a result, the superintendent argues, the shift-to-I rule did not apply to petitioner's drug convictions, and, therefore, not every attorney exercising reasonable

---

[6] Under ORS 475.005(8), "delivery" means "the actual, constructive or attempted transfer * * * from one person to another of a controlled substance."

skill and judgment would have advocated for the application of that rule. Similarly, the superintendent argues that the evidence supports the post-conviction court's implicit finding that petitioner acquired and handled the firearms at different times and under different circumstances not constituting part of the same criminal episode as petitioner's drug offenses, leading to the same conclusion. The superintendent alternatively argues that the evidence supports the inference that petitioner made a discrete decision to commit each offense, and therefore formed separate criminal objectives, again rendering the shift-to-I rule inapplicable and counsel's performance reasonable.

As the superintendent notes, we have previously concluded that the placement of drugs or weapons in different locations in a residence or vehicle supports the inference that the drugs or weapons were acquired, handled, or concealed at different times in support of separate criminal objectives. For example, in *State v. Collins*, 100 Or App 311, 313-14, 785 P2d 1084 (1990), *overruled on other grounds by State v. Torres*, 249 Or App 571, 277 P3d 641 (2012), the defendant was convicted of two counts of unlawful possession of a firearm. During a search of the defendant's pickup truck, officers found one handgun concealed under the driver's side of the front seat and another handgun under the passenger's side. In determining whether the defendant's offenses had been committed in the course of the same criminal episode, we reasoned that the offenses were not directed toward a single criminal objective because "the handguns were two separate objects, and there was evidence, such as placement of the guns in different parts of the pickup, that they were concealed by separate acts." *Id.* at 314.

In *State v. Padilla*, 118 Or App 122, 846 P2d 437 (1993), a consecutive sentencing case under ORS 137.123, we relied on our reasoning in *Collins* and drew a similar conclusion regarding firearms found in a residence. In *Padilla*, the defendant was convicted of three counts of delivery of a controlled substance and three counts of felon in possession of a firearm. During a search of the defendant's residence, police found three weapons in the family room. The defendant argued that the trial court could not impose consecutive sentences because all of the weapons were "located in

the same place at the same time" and, therefore, the charges arose out of "continuous and uninterrupted" conduct. *Id.* at 124. We noted, however, that the evidence in that case indicated that the defendant had allowed his nephews to use the firearms separately; thus, we concluded, the defendant's convictions did not arise from a single course of conduct. In reaching that conclusion, we reasoned that "[f]inding more than one weapon in a single location is not the equivalent of offenses committed in a continuous and uninterrupted course of conduct." *Id.* (internal quotation marks omitted).

In this case, it is undisputed that officers discovered the methamphetamine, heroin, and firearms in different locations throughout petitioner's residence. The record indicates, for example, that officers found large quantities of heroin in two backpacks, and separately found methamphetamine in a lock box in a closet. The discovery of the methamphetamine and heroin in different places within petitioner's home supports the post-conviction court's implicit finding that those controlled substances were acquired, handled, and concealed at different times and for different reasons. Additionally, petitioner's statement that the firearms were used as collateral or in trade for drug transactions, coupled with the post-conviction court's uncontested finding that petitioner had multiple buyers and engaged in multiple sales, supports the further finding that petitioner likely acquired the firearms at different times and separately from his constructive deliveries of methamphetamine and heroin. Given that evidentiary support, the post-conviction court could conclude that petitioner's conduct was not "continuous and uninterrupted" and "so joined in time, place, and circumstances" as to constitute a single criminal episode under ORS 131.505(4), and, therefore, that the shift-to-I rule did not apply.

Moreover, evidence in the record supports the post-conviction court's finding that petitioner's conduct was not aimed toward the accomplishment of a "single criminal objective" within the meaning of ORS 131.505(4). Petitioner's statement that he had only been selling methamphetamine for a short while and that he had accumulated the cash found in the apartment specifically to buy more methamphetamine supports the inference that he

made discrete decisions to deliver each controlled substance, such that the delivery of methamphetamine and the delivery of heroin were two separate criminal objectives. As in *Hathaway*, petitioner may have formed a distant or overriding goal to "engage in a drug-dealing enterprise," but the record supports the post-conviction court's determination that his delivery of each controlled substance and his possession of the firearms were in pursuit of more immediate and separate criminal objectives. 82 Or App at 511-16. To conclude otherwise would permit a defendant to convert any number of deliveries over a given period of time to a single criminal episode merely by forming an intent to "engage in a drug-dealing enterprise" in advance. *Id.* at 515. As we recognized in *Hathaway*, that "would not make sense[.]" *Id.*

Notwithstanding our earlier interpretations of "criminal episode," petitioner contends we have given that term a broader construction in more recent cases, including *State v. Witherspoon*, 250 Or App 316, 280 P3d 1004 (2012) (holding that multiple offenses committed by the defendant over the course of a night, including menacing his wife with a knife in the kitchen and assaulting her in the bedroom, were part of a single criminal episode and "shared a common criminal objective of harassing and injuring the victim through physical and emotional abuse"). Petitioner argues that, as in *Witherspoon*, there was no evidence in his case that his various offenses were interrupted in time, place, or circumstance. *See* 250 Or App at 326. Petitioner further suggests that, by improperly "parsing" the criminal objective common to all of his convictions—which, as noted, he characterizes as "engaging in a drug-dealing enterprise" or "making money from the sale of controlled substances"— the post-conviction court disregarded *Witherspoon*'s caution against construing ORS 131.505(4) too narrowly. *See id.* at 325 n 5 (citing *State v. Boyd*, 271 Or 558, 565 n 4, 533 P2d 795 (1975)).[7]

---

[7] Although we also have more recently stated that the first step in analyzing whether multiple convictions arise out of a single criminal episode is to determine whether a complete account of one offense necessarily includes details of another, *see Dulfu*, 282 Or App at 223, petitioner does not contend that his convictions are "cross-related" in that manner. *See id.* at 224 (offenses are "cross-related" when a complete account of one offense cannot be given without describing details of the other).

Two considerations require us to reject petitioner's contention that our recent decisions warrant the reversal of the post-conviction court's decision. First, as noted, the post-conviction court was required to evaluate defense counsel's performance in light of the law as counsel would have viewed it at the time of petitioner's sentencing, which occurred in December 2010. *See Burdge*, 338 Or at 498 (in evaluating whether counsel should have advanced a particular interpretation of a statute, the court must "look at the statute as a lawyer would have seen it at the time"). Because *Witherspoon* issued in 2012, well after the sentencing in petitioner's case, his attorney would not have had the benefit of that decision's analysis if, in fact, it would have supported a different outcome. Furthermore, petitioner does not argue—nor does the record support the argument—that *Witherspoon* merely reflects an argument that his attorney should have recognized or anticipated. *See, e.g., Walraven v. Premo*, 277 Or App 264, 279-83, 372 P3d 1 (2016) (counsel was deficient in failing to challenge a jury instruction that had not yet been held invalid, where a reasonably prepared attorney would have recognized that the instruction was suspect in light of our earlier rejection of the theory on which it was based). Thus, as the superintendent contends, *Witherspoon* has no bearing on the adequacy of counsel's performance in petitioner's case.

Second, other than making a generalized argument that we have viewed the term "criminal episode" more broadly in cases such as *Witherspoon*—a characterization that the superintendent does not wholly dispute—petitioner does not articulate any rationale gleaned from those cases that would dictate a different result in his case. For that additional reason, we reject petitioner's argument that the post-conviction court's decision is inconsistent with our current interpretation of "criminal episode" as it relates to his trial counsel's performance.

In sum, petitioner's convictions did not arise under the same "criminal episode" within the meaning of ORS 131.505(4). A defense attorney exercising reasonable professional skill and judgment could have concluded that the shift-to-I rule did not apply to petitioner's convictions and, therefore, chosen not to argue for the application of that rule.

Further, petitioner was not prejudiced by trial counsel's failure to make that argument because it would not have been successful. Therefore, the post-conviction court did not err in denying petitioner's request for relief. Accordingly, we affirm.

Affirmed.