No. 632            September 5, 2024            741

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ERNESTO DENIZ ZARAZUA,
*Defendant-Appellant.*

Linn County Circuit Court
22CR14592; A180316

Brendan J. Kane, Judge.

Submitted June 12, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and James Brewer, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Greg Rios, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

POWERS, J.

Affirmed.

**POWERS, J.**

Defendant appeals from a judgment of conviction for stalking, ORS 163.732, assigning error to the trial court's denial of his motion for judgment of acquittal (MJOA) for that offense.[1] The crime of stalking requires proof that a defendant engaged in repeated and unwanted contact with the victim; thus, there must be at least two actionable contacts. Defendant engaged in conduct with the victim, E, that was unwanted. He argues, however, that his actions were all part of a single course of conduct, and therefore a single contact. We conclude that there was sufficient evidence of more than one actionable contact, and therefore we affirm.

We review the denial of an MJOA to determine whether, after viewing the facts and all reasonable inferences in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Murphy*, 306 Or App 535, 536, 475 P3d 100 (2020), *rev den*, 367 Or 559 (2021).

We recount the facts in accordance with that standard. E was with defendant at his house in Salem one evening. They had just broken up, and E decided to leave. At defendant's urging, she came back inside the house and stayed for a while. She decided to leave again, and when she prepared to drive away, defendant jumped onto the hood of her car to prevent her from leaving. He hung onto the hood as she backed up, then he went around to the back of the car to block her from backing up. He then reached through the open passenger-side window, unlocked the door, and took the keys out of the ignition. He took the keys inside the house. E got out of her car and screamed at defendant to return her keys. She was trying to make noise so that defendant's landlord would hear and "help stop it."

E went back inside the house, continuing to demand that defendant return her keys. She tried to open defendant's hand to get her keys back. He said, "Oh, this is going to get violent, isn't it?" E stopped and "just stood there." Defendant dropped the keys and started crying. E picked up her keys.

---

[1] The 2021 version of ORS 163.732, which applies in this case, was amended in 2024. *See* Or Laws 2024, ch 90, § 2. Because the amendments do not affect the analysis in this case, we cite the current version of the statute.

Defendant asked E to stay the night, and she said no. Eventually, they started watching a movie, then E told defendant that she was going to leave, that she felt "weird" being there after they had broken up, and that she did not want to stay. At that point it was about 4:00 a.m. When E said she was going to leave, defendant started hitting himself in the head as hard as he could. When she walked toward the door, he "flipped over the bed" and blocked the door to the room. Then he sat down on a chair, which allowed E to run out of the room. As she was leaving, she could hear that he was "trashing" the room—flipping the table, and things were "flying" and crashing on the floor.

E got in her car and drove away. She took Interstate 5 (I-5) toward her home. After driving for about 10 to 15 minutes, she saw a text message from defendant that said, "I'm on my way. I'm on I-5." When she looked back, she could see the headlights of defendant's vehicle catching up to her. Defendant called E, and when she answered the phone, she told him to "go home," and she hung up. After that, he called her, and when she did not answer, he drove in the lane next to her and gestured for her to pick up the phone. She tried to change lanes, but he pulled in front of her and then braked "so that [she would] stop." Defendant kept calling her. E answered the phone again to tell defendant, again, to go home. Defendant screamed into the phone "at the top of his lungs."

As they approached the Albany exit, defendant was ahead of E, "doing the brake check again." He drove ahead and pulled over near the Albany exit sign so that he could see if she was going to exit, which she usually did, or keep driving.

E exited at Albany and saw that defendant was following her. She was "freaking out" because she lived alone and did not know what defendant's intentions were. She felt that "he was unstable *** and not in control of his emotions." Defendant kept trying to call E. Defendant called her at least 22 times between 4:00 a.m. and 5:00 a.m., including a stretch of 17 times in a row that she did not answer. At one point, E answered the phone, and defendant told her that it would end only if she called the police. E said, "Okay," then pulled over at a traffic light in Albany and called 9-1-1.

She then drove toward a police station in Albany. When she would stop at a traffic light, defendant would pull up next to her—sometimes in the oncoming traffic lane—and make gestures like "answer the phone," or "what are you doing?"

E pulled into the police station parking lot. Defendant initially drove past the lot, then made a U-turn, and parked a couple of spaces away from E. He started to get out of his car to approach her car. When he saw police officers approaching, he looked up, saw it was a police station, and got back into his car. An officer escorted E into the police station, and an officer stayed outside with defendant.

Defendant was charged with stalking. He waived his right to a jury and was tried to the court. After the state rested, defendant moved for a judgment of acquittal, arguing that the state had not adduced sufficient evidence that he had engaged in repeated unwanted contact. He argued that the evidence showed only a single, continuing contact. The trial court denied the motion, and ultimately found defendant guilty of stalking.[2]

On appeal, defendant argues that the trial court erred by denying his MJOA.

ORS 163.732(1) provides:

"A person commits the crime of stalking if:

"(a)   The person knowingly alarms or coerces another person or a member of that person's immediate family or household by engaging in repeated and unwanted contact with the other person;

"(b)   It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c)   The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

A contact includes "[c]oming into the visual or physical presence of the other person," "[f]ollowing the other person,"

---

[2] Defendant was also charged with an open-container violation. The trial court acquitted him of that violation.

"[s]ending or making written or electronic communications in any form to the other person," "[s]peaking with the other person by any means," and "[c]ommitting a crime against the other person." ORS 163.730(3)(a), (b), (d), (e), (g).

Defendant challenges only whether there was sufficient evidence of "repeated and unwanted contact." Specifically, defendant disputes whether there was sufficient evidence of more than one alarming—*i.e.*, "actionable"—contact. A contact is "actionable" if individually it gives "rise to subjective and objectively reasonable alarm or coercion." *K. R. v. Erazo*, 248 Or App 700, 706, 274 P3d 214 (2012).

Here, the evidence was sufficient for a factfinder to find more than one actionable contact. First, defendant jumped on the hood of E's car to prevent her from leaving, and then took her keys out of the ignition, brought them into his house, and physically tried to prevent E from getting them back. E was alarmed enough to scream in an attempt to get help from defendant's landlord. A factfinder could find that her alarm was objectively reasonable.

Second, defendant later tried to block E from leaving his room, was hitting himself in the head, and after she ran out, was trashing the room. E left to drive home and, after driving for 10 to 15 minutes, saw that defendant had contacted her again. He continued to call her repeatedly even after she told him to go home. Defendant was also following her, and driving in front of her and braking, which risked an accident at highway speeds. In addition, he positioned his car so that he would be able to follow her whether she kept driving on I-5 or took the Albany exit. E was alarmed enough by that conduct that she called 9-1-1 and drove to a police station for help. A factfinder could, again, find that her alarm was objectively reasonable.

From those facts, a rational factfinder could find that there were at least two distinct actionable contacts. Assuming without deciding that continuous conduct cannot constitute multiple contacts, defendant's contacts here were not linked by continuous conduct. They were distinct courses of conduct, involving different alarming behavior. E had felt that she could drive home, even though she lived

alone, until defendant—who had been trashing his room when she left—began following her on I-5.

We are not persuaded by defendant's arguments to the contrary. Defendant's conduct was not analogous to that described in *Jennings v. Gifford*, 211 Or App 192, 196-97, 154 P3d 163 (2007) (concluding that the respondent's coming into visual range of the petitioner's daughter twice on one occasion while looking for her at her school did not satisfy requirement of "repeated and unwanted contact" in ORS 163.738(2)(a)(B)). We also are not persuaded by the argument based on *State v. Witherspoon*, 250 Or App 316, 325, 280 P3d 1004 (2012), involving the sentencing concept of a continuous and uninterrupted course of conduct constituting a single criminal episode.

As discussed above, the evidence in this case supports at least two actionable contacts—even setting aside that the contacts were of different types, accomplished by different means—with at least one break in which defendant and E were not in contact, and defendant was occupied with trashing his room rather than continuing to engage in actionable contact. That is, when defendant, in E's direct presence, blocked her from leaving his room, then began "trashing his room" while E left and drove away, that was at least one contact, which was followed by a break. Defendant then again contacted E when he followed E and drove dangerously on the freeway, coming into her visual range, which was a significantly different contact from what had occurred before the break.

Affirmed.